Filed 11/19/14  In re B.L. CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re B.L. et al., Persons Coming Under the Juvenile Court Law. | B255669 (Los Angeles County Super. Ct. No. CK87917) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. TAYLOR C., Defendant and Appellant. | |

APPEAL from order of the Superior Court of Los Angeles County, Amy Pellman, Judge.  Affirmed.

Cristina Gabrielidis, under appointment by the Court of Appeal, for Defendant and Appellant.

Richard D. Weiss, Acting County Counsel, Dawyn Harrison, Assistant County Counsel, and Kimberly A. Roura, Deputy County Counsel, for Plaintiff and Respondent.

# I. INTRODUCTION

The mother, Taylor C., appeals from the February 4, 2014 order denying her continuance request and terminating her parental rights. She contends the juvenile court abused its discretion by denying her continuance request. The mother argues there was good cause for continuing the Welfare and Institutions Code[1] section 366.26 hearing. She contends a continuance would have permitted her to present evidence of a parent-child relationship benefit exception to adoption. We find no abuse of discretion occurred. We affirm the parental termination order.

# II. PROCEDURAL HISTORY

On May 20, 2011, the Los Angeles County Department of Children and Family Services (the department) filed a section 300 petition on behalf of 22-month-old B.L. and 5-month-old Ruben L. Jr. The petition alleges the children were dependents of the juvenile court under section 300, subdivisions (a), (b), (e) and (j). The petition alleges on May 17, 2011, Ruben Jr. was medically examined and found to suffer: an acute displaced fracture of his left femur (thigh bone); a fracture of his left humerus (upper arm bone); a healing fracture of his left ulna (forearm bone); healing fractures of three of his left ribs; and compression of his midthoracic vertebrae (spine). The petition alleges: Ruben Jr.'s injuries allegedly were consistent with physical abuse and the child being slammed, shaken and grabbed; the mother and father, Ruben L. Sr., failed to obtain timely necessary medical care for Ruben Jr.'s injuries; the parents' deliberate, unreasonable and neglectful acts endangered Ruben Jr.'s physical and emotional health, safety and well-being; and the foregoing created a detrimental home environment and placed B.L. at risk of physical and emotional harm, damage and danger.

---

[1] Further references are to the Welfare and Institutions Code.

At the May 20, 2011 detention hearing, the children were detained and removed from the home.  The department was granted discretion to release the children to any appropriate relative.  The parents were granted monitored visits twice a week and ordered to participate in individual counseling.

At the September 15, 2011 adjudication and disposition hearing, the parents submitted on the petition to the juvenile court's jurisdiction.  The juvenile court sustained the petition in its entirety under section 300, subdivisions (a), (b), (e) and (j).  The juvenile court declared the children dependents and removed them from the parents' custody.  The juvenile court granted the parents reunification services including: monitored visits twice a week for one hour each visit; individual counseling; a psychological evaluation; and anger management group counseling.

On October 4, 2011, the mother filed a walk-on request seeking visitation with the children.  The mother reported she had not had visits with the children since the last court date of September 15, 2011.  On the same day, the juvenile court ordered the department to provide a written report on the mother's visits and visitation schedule to be provided within three days.  The juvenile court stated the visits were to be at least twice per week. On December 13, 2011, the juvenile court found the parents were not following the case plan and continued reunification services.  The children were ordered placed in an adoptive home.

On July 20, 2012, the juvenile court found the parents were in compliance with their case plans.  The parents had consistently and regularly contacted and visited the children.  The parents had made significant progress in resolving the problems that led to the children's removal from the home.  The parents were granted loosely monitored visits with the department having discretion to allow the parents two hours of unmonitored visits per week.

On February 4, 2013, the juvenile court found the parents were in partial compliance with their case plans.  The juvenile court terminated family reunification services for the parents.  In addition, the juvenile court scheduled a section 366.26 hearing for June 3, 2013.  Later, the section 366.26 hearing was continued several times

3

to allow time for completion and approval of the relative caregivers' adoption home study.

At the February 4, 2014 section 366.26 hearing, the mother's counsel requested a continuance. The sole basis of the continuance request was the mother was not present. The mother's counsel stated: "Your Honor, I am requesting a continuance on this matter. I did attempt to contact the client this morning by phone. The number that I had for her was not accepting messages. We did send a letter regarding today's hearing. And I know the department did provide courtesy notice. However, I don't know why my client is not here. It is possible there's been some sort of emergency situation, and, I am, therefore, requesting a brief continuance to attempt to obtain direction from her." The juvenile court denied the continuance request. The juvenile court found notice was proper and it would not be in the children's best interest to continue the hearing. The mother's counsel then stated, "In my view of the documents without input from my client, it appears there would not be enough for me to meet my burden, so I will withdraw the contest."

The juvenile court found by clear and convincing evidence that the children were adoptable with prospective adoptive parents ready, willing and able to adopt the youngsters. In addition, the juvenile court found there was no exception to adoption. The juvenile court terminated parental rights and appointed Joseph and Chantell L. as the prospective adoptive parents.

The mother filed her notice of appeal on March 24, 2014.

### III. EVIDENCE

### A. Detention Report

On May 17, 2011, children's social worker Felix Nwosu received a referral alleging the parents physically abused five-month-old Ruben Jr. Mr. Nwosu arrived at the Children's Hospital and interviewed hospital social worker Brett McGillivray. Mr. McGillivray stated a skeletal survey showed Ruben Jr. had: left and right femur

4

fractures; three or four healing left rib fractures; and a healing left arm fracture. Mr. McGillivray reported Ruben Jr.'s injuries were consistent with a child who had been grabbed and shaken several times.

Mr. Nwosu interviewed the parents about Ruben Jr.'s injuries. The parents were by Ruben Jr.'s bedside along with his sister, two-year-old B.L. Ruben Jr. had splints on both femurs. In addition, the infant had an "'Ace Bandage'" wrapped around his rib cage.

The mother stated she was in the kitchen cooking and the father was playing a video game in the living room. She heard a loud cry of pain and ran into the room where the children were located. The mother saw B.L. on top of Ruben Jr. The mother picked up Ruben Jr. and he continued to scream in pain. The parents decided to call an ambulance and Ruben Jr. was transported to Good Samaritan Hospital. The family was later transported to Children's Hospital because there was no pediatric staff at Good Samaritan Hospital. The mother stated the hospital staff never told her they found other fractures on the baby. She was unaware Ruben Jr. had three or four healing rib fractures. The mother stated sometimes the paternal grandmother, Denise Hill, would watch the children. Other times, the great grandmother, Sally McBride, would care for the children.

The father stated he was in the living room playing a video game. While there, the father heard Ruben Jr. scream. He and the mother both ran to the room where the children were located. Ruben Jr. appeared to be in serious pain. The baby cried nonstop and would scream even louder when they touched his body parts. The parents called the ambulance and transported Ruben Jr. to the hospital. The father did not know about the child's rib or arm fractures. He stated the paternal grandmother and maternal great grandmother sometimes watched the children.

On May 18, 2011, Mr. Nwosu spoke with Ms. McBride, the maternal great grandmother. She stated she occasionally watched the children. Ms. McBride said she never observed Ruben Jr. being uncomfortable. She vehemently denied knowing about Ruben Jr.'s old healing fractures. Ms. Hill, the paternal grandmother, stated she

sometimes watched the children. She did not notice any fall or observe any pain when watching Ruben Jr. Ms. Hill strongly denied she had done anything to hurt Ruben Jr.

## B. Jurisdiction and Disposition Report

The jurisdiction and disposition report was prepared by dependency investigator Candis Nelson and filed on June 7, 2011. The report indicates the parents were arrested on May 19, 2011, and charged with felony child endangerment resulting in great bodily injury or death. The report includes an arrest report from the Los Angeles Police Department.

According to the police report, the mother told Detective Moses Castillo that on May 16, 2011, she heard Ruben Jr. crying on the air mattress in their bedroom. She and the father ran into the bedroom and found B.L. on top of Ruben Jr. The mother stated B.L. must have jumped on the bed and landed on Ruben Jr. She asked for a polygraph examination after she learned that the father had agreed to submit to one. During the pre-polygraph exam interview, the mother admitted she saw the father "exercise" Ruben Jr.'s legs. She observed the father pushing Ruben Jr.'s legs back up to the baby's chest area with medium force. The mother stated she did not tell the hospital staff about the exercises because she was afraid.

The father stated B.L. jumped on Ruben Jr. and caused the injury. The father admitted the maternal great grandmother had told the mother that something was wrong with Ruben Jr. on May 14, 2011, because the baby was fussy and cried a lot. The father agreed to undergo a polygraph examination. After the polygraph examination, the father was interviewed. Detective Castillo described the father's statements made after the polygraph examination: "[The father] admitted to [the polygraph examiner] and to me that he could have caused the fractures to . . . Ruben's femurs while playing too rough with him. [The father] demonstrated how he grabbed . . . Ruben[] by grabbing my wrists and pulling my arms towards him and then back towards me towards my upper chest area. [The father] stated he did [this] type of movements to exercise . . . Ruben's joints.

6

He stated he may have done these motions [to Ruben] without any intention of causing any injuries." The father wrote letters of apology to Ruben Jr. and a deputy district attorney.

On May 31, 2011, the mother was released from jail on her own recognizance but the charges remained pending against her. The father remained in custody. Ms. Nelson was unable to interview the parents without their attorneys present because of a court order.

Ms. Nelson interviewed Ms. McBride, the maternal great grandmother, and Ms. Hill, the paternal grandmother, for the jurisdiction and disposition report. Ms. McBride reported on the evening of May 14, 2011, the mother dropped off the children. Ruben Jr. was asleep but would cry when she moved him. When the infant woke up, Ms. McBride noticed he had a fever. Ms. McBride contacted the mother who returned about 10 minutes later to pick up the children. The mother stated she would take the child to the doctor but did not do so. Ruben Jr. was not taken to the hospital until May 17, 2011, as a result of his leg fracture.

Ms. McBride stated the mother had run away from home at age 13. The mother was estranged from her family for about a year when she returned home pregnant with B.L. The mother lived with Ms. McBride following B.L.'s birth. But the mother left when B.L. was about six months old after getting into an argument with the maternal grandmother. The mother then moved in with Ms. Hill, the paternal grandmother. Ms. McBride had no contact with the father, stating: "'I only know his name. I don't even know how old he is.'" Ms. McBride added, "'[The father] would put [the mother] out and he would hit her upside her head a few times.'" Ms. McBride recalled one time when the father put the mother and B.L. out of the home while it was raining outside. Another time, the mother arrived at Ms. McBride's home. The mother had a bruise and a mark on her forehead but she did not explain how she got them. Ms. McBride did not have concerns for B.L. But about a month ago, Ms. McBride observed B.L. tapping Ruben Jr. and telling him "'hush'" and "'shhh'" when the baby was crying.

7

Ms. Hill, the paternal grandmother, and a 16-year-old daughter, April, have cared for the children in the past. Ms. Hill stated the children were well-taken care of by the parents. Ms. Hill was unaware of domestic violence between the parents. Ms. Hill reported the family lived with her for nearly a year before the mother moved out. The mother moved out because of problems with the maternal grandmother.

Ms. Nelson also interviewed Joseph, the children's maternal great uncle. Joseph had little or no contact with the father. Joseph stated there had been domestic violence between the parents and the father was the perpetrator. Joseph told the mother he "did not want 'that drama' around" his home and family. The mother followed Joseph's rule and did not visit with the father.

In addition, Ms. Nelson interviewed Sandy Himmelrich, the coordinator of the Children's Hospital CARES Team. Ms. Himmelrich stated B.L.'s skeletal survey showed one old skull fracture and a possible second skull fracture. A scan of B.L. did not show any abnormalities in her brain functioning. Ms. Himmelrick reported B.L. appeared "'skittish'" and somewhat fearful of any anticipated pain.

Ms. Himmelrich confirmed Ruben Jr. had a "'butterfly'" fracture to his femur bone and healing fractures to his ulna, humerus and three ribs. The rib fractures were likely caused by someone squeezing the child with force. The infant also had a vertebrae compression fracture. The vertebrae fracture was consistent with the child being "'slammed down'" on something. Ms. Himmelrich indicated the injuries were in different stages of healing and may have been inflicted at various times though there might be some time overlap.

Ms. Nelson reported the parents had not visited the children because of their incarceration. Ms. Nelson recommended the mother receive monitored visits while not incarcerated. She recommended the father receive monitored visits after his release. She recommended the parents receive no reunification services pursuant to section 361.5, subdivision (b)(5).

C.  Last Minute Information for the Court Reports

The August 4, 2011 last minute information for the court report states in June, the mother had called to arrange visitation with the children.  But the mother's contact with Michelle Ramirez, the social worker, diminished once the father was released from jail on June 22, 2011.  The father had not contacted Ms. Ramirez since his release.  The Children's Hospital CARES team indicated Ruben Jr.'s leg might be stunted with his left leg shorter than his right leg.  The October 4, 2011 last minute information for the court report indicates the mother visited the children every Monday for one hour.  But the mother stopped visiting regularly once the father was released from jail and she began working.

D.  March 15, 2012 Status Review Report

The status review report states the children were placed with their maternal great uncle and aunt, Joseph and Chantell, on June 7, 2011.  The children were "extremely bonded" to their caregivers and were happy and comfortable.  Joseph and Chantell indicated they wanted to adopt the children.

The mother was in partial compliance with the court orders.  The parents were visiting consistently, once a week for two hours, since October 2011.  The mother completed a parenting class and was participating in anger management counseling and individual therapy.  But the mother continued to deny Ruben Jr. suffered any injuries other than the femur fracture.  As noted, the mother claimed the femur fracture was caused by B.L.  The parents had no explanation for Ruben Jr.'s other injuries.  They insisted Ruben Jr. did not have multiple fractures because they were never shown the X-rays.

### E.  July 20, 2012 Status Review Report

The status review report indicates the parents were convicted of child endangerment resulting in great bodily injury.  They were placed on 5 years of formal probation and ordered to complete a 52-week parenting program.  In addition, the father was ordered to complete a child abuse counseling program and 45 days of Caltrans work or graffiti removal.  The mother was doing well on probation and  compliant with her orders.  The parents were living together and had moved last month.  The parents had completed the anger management classes ordered by the juvenile court but they were not participating in individual therapy.  The parents were visiting the children once a week.

### F.  February 4, 2013 Interim Review Report

The interim review report states the parents were in partial compliance with the juvenile court orders.  The parents' weekly visits remained monitored in a neutral setting because they refused to visit in the caregivers' home.  The parents reported completing 14 parenting classes but the progress letter from the parenting program showed they attended only five classes.  In addition, the parents had not enrolled in individual counseling in the past four months.  Also, the parents were not in compliance with all of their probation conditions because they failed to enroll in a 52-week parenting program.  Furthermore, the father had neither attended child abuse counseling nor completed his 45 days of Caltrans service.  In addition, the parents refused to take responsibility for any of the injuries to Ruben Jr.

The children had been in the care of the prospective adoptive parents since June 2011.  The children were "thriving with their maternal [great] aunt and uncle and have become a part" of their household.  Joseph and Chantell wanted to adopt the children and provide them with a permanent home.

G. June 3, 2013 Section 366.26 Report

The section 366.26 report recommends termination of parental rights with adoption as the permanent plan for the children. Since the February 2013 court hearing, the parents had not visited as often or regularly with the children. The children had been in the care of Joseph and Chantell for nearly two years. Joseph and Chantell were "bonded with the children" and "committed to providing them with a safe, secure, and permanent family" through adoption.

H. February 4, 2014 Status Review Report

The status report states the parents visited the children consistently in July and August 2013. But once Joseph and Chantell moved from Los Angeles to Montclair in late August 2013, the parents visited less often. After the move, Chantell and the children initially would go to Los Angeles almost every Monday so she offered the parents a chance to see the youngsters there. The parents visited the children a couple of times in Los Angeles in September and October 2013. The parents visited the children for the first time in Montclair on October 25, 2013. The parents visited the children twice in November and arranged to visit the children on Christmas Eve. The children enjoyed the visits with their parents. But B.L. no longer asked for her parents after the visits. B.L. used to cry hard at the end of the visits but now handled the goodbyes much better.

The children were happy and doing well with Joseph and Chantell. The children were friendly and well-behaved during home visits and there were no behavioral problems. The adoption home study had been completed but was not approved yet. In November 2013, Chantell's children turned 18 so they need to submit to a Live Scan. However, Chantell's children had no valid state-issued identification cards so they could not submit to background checks until they obtain these cards. It was anticipated the home study would be approved once the department received the Live Scan results for Chantell's children.

## IV. DISCUSSION

As noted, the mother made a motion to continue the parental termination rights hearing. Under section 352, subdivision (a), no continuance shall be granted that is contrary to the interest of the child. Section 352, subdivision (a) states in part: "In considering the minor's interests, the court shall give substantial weight to a minor's need for prompt resolution of his or her custody status, the need to provide children with stable environments, and the damage to a minor of prolonged temporary placements. [¶] Continuances shall be granted only upon a showing of good cause and only for that period of time shown to be necessary by the evidence presented at the hearing on the motion for the continuance." We review the juvenile court's denial of a continuance request for abuse of discretion. (*In re Mary B.* (2013) 218 Cal.App.4th 1474, 1481; *In re Giovanni F.* (2010) 184 Cal.App.4th 594, 605; *In re Elijah V.* (2005) 127 Cal.App.4th 576, 585.)

The mother argues the trial court abused its discretion in denying her February 4, 2014 continuance request. She does not dispute she received notice of the section 366.26 hearing yet failed to appear at the proceeding. However, the mother contends there was good cause to briefly continue the section 366.26 hearing because she had attended most of the significant court dates. Given the deferential standard of review, the mother's contention is meritless.

The mother asserts she was serious about the case because she utilized reunification services. But the mother's reunification services were terminated because she was only in partial compliance with the court orders. As of February 2013, the mother: was not in individual counseling; had attended only five parenting classes; and failed to comply with her probation condition of enrolling in a 52-week parenting program. The mother refused to take responsibility for any of the injuries and denied Ruben Jr. suffered any injuries other than the femur fracture.

12

The mother also argues had she been granted a continuance, she would have testified as to the parent-child relationship benefit exception to adoption under section 366.26, subdivision (c)(1)(B)(i).  But in requesting the continuance, the mother's counsel did not state there would be any such testimony at the section 366.26 hearing.  Rather, the only stated justification was a desire to speak to the mother as to how she wished to proceed.  Thus, the mother has forfeited the issue of whether the parent-child relationship exception applied in this case.  (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 221-222; *In re Erik P.* (2002) 104 Cal.App.4th 395, 402-403.)

Even if the issue has not been forfeited, there is no basis for concluding the mother would have met her burden of establishing a parent-child relationship benefit exception.  This exception applies when "[t]he court finds a compelling reason for determining that termination would be detrimental to the child" because of regular visitation.  (§ 366.26, subd. (c)(1)(B)(i); *In re K.P.* (2012) 203 Cal.App.4th 614, 621-622.)  Here, the mother failed to maintain regular visits with the children.  At most, the mother had monitored visits with the children once a week for two hours.  More recently, the February 4, 2014 status review report indicates the mother only visited the children several times in September and October 2013.  This occurred less frequently after Joseph and Chantell moved to Montclair.  She also visited the children twice in November and on Christmas Eve but there is no evidence of any subsequent visits.

In addition, there is little evidence of a bond between the mother and the children.  On past visits, B.L. would cry hard at the end of the visits and ask for her parents.  But B.L. now no longer asked for her parents after the visits.  The children, who have been placed with their maternal great uncle and aunt since June 2011, were happy, doing well and bonded with Joseph and Chantell.  The children were thriving and had become a part of the household of Joseph and Chantell.  In addition, Joseph and Chantell wanted to adopt the children and provide them with a permanent home.  Even if a continuance had been granted, the mother has not shown that the parent-child relationship exception applied here.

13

## V. DISPOSITION

The parental termination order is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

TURNER, P. J.

We concur:

MOSK, J.

GOODMAN, J.[*]

---

[*]Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.